Filed 10/17/13  P. v. Cravens CA4/1
Opinion following remand from Supreme Court

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D054613 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD206917) |
| SETH CRAVENS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, John S. Einhorn, Judge.  Affirmed.

Randall Bookout, for the Defendant and Appellant, under appointment by the Court of Appeal.

Kamala D. Harris, Attorney General, Dane R. Gillette, Julie L. Garland, Gary W. Schons, Assistant Attorneys General, Lilia E. Garcia, Pamela Ratner-Sobeck, Lynne G. McGinnis, Jeffrey J. Koch, Deputy Attorneys General, for the Plaintiff and Respondent.

A jury convicted Seth Cravens of second degree murder (Pen. Code[1] § 187, subd. (a); making a criminal threat (§ 422); battery (§ 242); and four counts of assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(1)). As to one of the assault counts, the jury found Cravens personally inflicted great bodily injury. (§§ 1192.7, subd. (c)(8) and 12022.7, subd. (a).) The jury found Cravens not guilty of two additional assault counts and an additional battery count. The court sentenced Cravens to 20 years to life in state prison.

Cravens contends (1) there is insufficient evidence of implied malice to support the second degree murder conviction; (2) the trial court committed reversible error by not sua sponte instructing the jury that under *People v. Garcia* (2008) 162 Cal.App.4th 18 (*Garcia*), an unintentional killing without malice during the course of inherently dangerous assaultive felony constitutes voluntary manslaughter; (3) the court prejudicially erred by denying his motion to sever the second degree murder count from the other counts; (4) an inconsistent and confusing jury instruction regarding consideration of evidence of other charged crimes in connection with the murder count allowed the jury to convict him of the other crimes by a preponderance of the evidence rather than by proof beyond a reasonable doubt; and (5) the conviction of making a criminal threat must be reversed because there is insufficient evidence that Cravens made or aided and abetted a criminal threat.

---

[1]     All statutory references are to the Penal Code unless otherwise specified.

2

In our initial unpublished opinion in this matter, we agreed with Cravens that there was insufficient evidence of implied malice to support the second degree murder conviction. Accordingly, we modified the judgment by reducing the murder conviction to voluntary manslaughter and affirmed the judgment as modified. We did not address Cravens's contention that the trial court committed reversible error by not sua sponte instructing the jury on the theory of voluntary manslaughter articulated in *Garcia*, *supra*, 162 Cal.App.4th 18 because our reduction of the murder conviction to voluntary manslaughter rendered that contention moot.

The California Supreme Court granted the People's petition for review and reversed our judgment to the extent it ordered modification of the second degree murder conviction. (*People v. Cravens* (2012) 53 Cal.4th 500.) The Supreme Court remanded the matter to this court for further proceedings. In a supplemental brief, Cravens renews his contention that the judgment must be reversed because the trial court failed to sua sponte instruct the jury on the theory of voluntary manslaughter articulated in *Garcia*, *supra*, 162 Cal.App.4th 18. He also contends the Supreme Court's opinion in this case demonstrates that joinder of the other offenses deprived him of due process of law.

After the People filed a responding supplemental brief and the case was submitted under California Rules of Court, rule 8.256(d)(2), we issued an order vacating the submission and stating that oral argument would be set after the California Supreme Court filed its opinion in *People v. Bryant*, review granted November 11, 2011, S196365, in which the Supreme Court considered the *Garcia* theory of voluntary manslaughter.

The Supreme Court filed that opinion on June 3, 2013. (*People v. Bryant* (2013) 56 Cal.4th 959 (*Bryant*).) Having considered the opinion in *Bryant*, we affirm the judgment.

FACTS

*Second Degree Murder (Count 12 — Victim Emery Kauanui)*

Prosecution Evidence

Cravens was convicted of murdering Emery Kauanui. Kauanui had been friends with Cravens and a group of Cravens's friends that included codefendants Eric House, Orlando Osuna, Matthew Yanke, and Henri Hendricks.[2]

On May 23, 2007, Kauanui and his girlfriend, Jennifer Grosso made plans over the telephone to meet that evening at a bar in La Jolla called the Brew House. Around 8:00 p.m. Grosso told Kauanui she had to work late and would not be able to meet him until around 10:30 p.m. She arrived at the Brew House between 11:00 and 11:30 p.m. and joined Kauanui, who was sitting at the bar with two friends. He was in a cheerful mood when they met. As the evening progressed he became intoxicated.

About 30 minutes after Grosso arrived at the Brew House, Cravens walked into the bar with House, Osuna, and Yanke. Grosso was not sure whether Hendricks was also with Cravens's group. She knew Cravens and was excited to see him. She greeted him with a hug. Cravens and his friends stood close to where Grosso and Kauanui were standing. Grosso testified that "[i]t was very close quarters. Everyone was kind of elbow to elbow."

---

[2] The codefendants pled guilty to various offenses and were not tried with Cravens.

4

While Kauanui was holding a full drink in his hand and dancing with Grosso, he accidentally spilled some of his drink on House. House became hostile, and told Kauanui something to the effect of, "You better watch out . . . . I can knock you out in one punch." The situation became tense as Kauanui and House exchanged words and Cravens joined in. Grosso testified, "Seth came in and started making comments like, . . . You know Eric could beat your ass. Like don't say anything. It was slightly joking but then became aggressive . . . on both ends. And Emery kept asking him, like, what are you saying to me? Like what — do you guys have like a problem?" According to Grosso, an employee of the bar intervened and told everyone they had to leave. She quickly paid the bar tab and then grabbed Kauanui by the arm and walked out of the bar with him and one of the bar's bouncers.

Ron Troyano, who was the manager on duty at the Brew House that night, testified that when he became aware of the "verbal altercation" between Kauanui and House, he walked up to House and asked him what the problem was. House said someone spilled a drink on him and his shirt was wet, but he told Troyano something to the effect of, "We're all friends. Nothing to worry about." Troyano concluded no action was required and resumed other duties at the bar.

Troyano later saw one of the bartenders walking toward a backroom where a pool table was located. Troyano went into the backroom and saw the bartender standing between Kauanui and Cravens. The bartender told him, "These guys need to go." Troyano thought it would be difficult to remove "multiple individuals" and observed that Kauanui was calm, so he asked Kauanui to leave the bar, thinking that was the easiest

5

way to diffuse the situation. When Kauanui questioned why he alone was being asked to leave, Troyano explained that he just wanted to get Kauanui out of there and that he would take care of the others. Kauanui said he was concerned about getting jumped. Troyano told him nothing was going to happen and walked him out of the bar.

Grosso testified that Cravens, House, Yanke, Osuna, and Hendricks followed her and Kauanui out of the bar into the parking lot, where the verbal confrontation between House and Kauanui resumed. Grosso grabbed Kauanui's arm and took his keys and said, "Let's go. We're leaving right now." Kauanui got into his car with Grosso and she drove to his house, which took only a couple of minutes.

As Grosso pulled up to Kauanui's house, Kauanui was speaking confrontationally on his cell phone with someone, saying, "If you want to fight me one on one, I'll fight you." As they exited the car, Grosso yelled at him to get off the phone. They went into Kauanui's house and Grosso expressed her frustration with his behavior. She told him that it was "really dumb and immature for [him] to be acting like that," that he should just let the situation go, and that she "was not going to be around if [he acted] this way." Kauanui immediately became calm and apologetic, and pleaded with Grosso not to leave. She assured him she would stay with him. The other family members who lived in the house with Kauanui were out of town.

Grosso had left her own car in a Vons parking lot near the Brew House and was concerned that it would be towed because patrons of the Brew House were not supposed to park there. Because Kauanui was too intoxicated to drive, she decided to walk to her car and then drive it back to Kauanui's house. He offered to drive her but she declined.

6

She assured Kauanui that she would return shortly and told him to get ready for bed.  He was calm when she left.

She walked down an alley that led to the Brew House and started jogging because it was dark and she felt unsafe.  She was struck by a "weird feeling" that caused her to start running toward the Brew House to "make sure everything was diffused and okay." As she approached the Brew House, she saw Cravens, House, Osuna, Yanke, and Hendricks outside the bar, and heard Cravens say, "Don't call him.  I know where he lives.  Let's go fuck him up."  Their behavior was rowdy and aggressive.  She screamed "Seth," hoping that because Cravens knew her, he would "not do this to me or to us." Cravens looked in her direction but nobody responded to her.  She saw Cravens and others get into a Ford Explorer.  The Explorer drove quickly past her in the direction of Kauanui's house and she saw that Osuna was driving.

Grosso panicked and immediately dialed Kauanui's number but he did not answer. At the same time, she looked into the Brew House and told Dave Woods and Nur Kitmitto, Kauanui's friends who were with him when she first arrived at the bar, that Kauanui was going to get jumped.  She then ran to her car and drove as quickly as possible back to Kauanui's house.  She was about one to two minutes behind the Explorer.

As Grosso approached Kauanui's house, she saw the Explorer parked on the street and a confrontation outside of the house.  She turned the corner and her car's headlights shone on Kauanui and House fighting in the street.  Kauanui was on the ground and House was on top of him.  Cravens and Osuna were standing a few feet behind them.

7

House was punching Kauanui on the sides of his stomach, while Kauanui had one of his arms wrapped around House's shoulder and appeared to be trying to put him in a headlock. As she turned the corner, Grosso held her horn down to wake the neighbors and get help. She also called 911, but did not remember talking to anyone because she was "yelling at everyone to stop" at the same time. She got out of her car and was "screaming and cussing and making a huge scene."

Because House did not respond to her, Grosso began violently kicking him and telling him to get off of Kauanui. House reacted by repeatedly saying, "Get her the fuck off of me." Grosso heard someone say, "What the fuck are you doing? You're crazy bitch. You're crazy." Then Hendricks or Yanke picked her up and moved her away from the fight. She screamed the names of Cravens, Yanke, and House so the neighbors would hear, and screamed that she was calling the police and they were all going to jail. She testified that she was in a complete panic and was yelling, "Get the fuck out of here. Leave him alone." When no one reacted, she began kicking the Explorer's headlights.

She looked back to Kauanui and saw that he was standing and directing his attention to Cravens, who was standing about five or six feet away from him. There was no aggression in Kauanui's demeanor, and his arms were at his sides. He then raised his arms waist high with his palms facing upward, and said to Cravens, "How the fuck you going to jump me at my house?" Cravens said nothing in response, but walked up to Kauanui and, according to Grosso, "just gave him one extremely hard punch, and Emery just fell back immediately. It was like the lights went out in Emery and he fell back." Kauanui fell straight back and did not try to break his fall. Grosso heard his skull crack

8

when it hit the pavement and saw blood immediately begin to pool from the back of his head.  She thought he was dead.

Grosso "went crazy" and started screaming, "Fuck all of you guys.  None of you are going to get away with this.  She looked at Cravens and asked, "Why would you do this?  Why would you do this to me?  Why?"  Cravens did not respond to her.  He said to his friends, "Come on.  Come on.  Let's go."

Grosso saw two people other than Cravens or House kick Kauanui on his side after he was down and blood was pooling around his head.  She interpreted it as a "we won type of final kick" delivered with "medium force."  She then saw some members of Cravens's group get into the Explorer and drive quickly away, leaving House behind on the ground searching for something.  Grosso was later told he was looking for a tooth he had lost in the fight.  Around the same time the police arrived on the scene.  Four of Kauanui's friends, including Woods and Kitmitto, were also there, having heard that Kauanui was going to get jumped.  They tried to calm Grosso as she knelt beside Kauanui, who was unconscious.  The police arrested House and an ambulance arrived.  Grosso rode with Kauanui in the ambulance to a hospital.

Erica Wortham and her husband Philip Baltazar lived across the street from Kauanui.  Baltazar testified that at 1:18 a.m. on May 24, 2007, he awoke and heard Kauanui yelling antagonistically into his cell phone "something like, you know, Motherfucker.  You're acting like a fucking child."  He also heard a woman's voice telling him to come inside and to get off the phone.  He looked out the window and saw Kauanui

9

pacing on the sidewalk in front of his house and screaming into his phone. Baltazar went to a back room to sleep, thinking "it was over."

Around 1:40 a.m. Wortham awoke to loud voices in the street. It sounded like "guys approaching" with an "aggressive kind of salutation." She went to the balcony window and saw four males approaching Kauanui who was standing nearby on the street. She immediately decided to call 911 because it appeared the four males intended to get into a fight. She yelled out the window, "I'm calling the cops," but it had no effect on them. She left the balcony to make the call and while she was on the phone with the operator, she heard, but did not see, what was happening on the street. Baltazar, who was awakened by her dialing 911, came and stood in the doorway of the balcony while she made the call. After Wortham moved away from the balcony, she heard fighting. It sounded like "flesh hitting flesh" and "a lot of blows, a lot of hitting. Like a maul." When she returned to the balcony, she saw Grosso flashing the lights of her car, honking the horn, and sounding the car alarm to get attention. Grosso then came over to where Kauanui was on the ground with a man on top of him and started kicking the man on top of Kauanui and screaming at him to get off. The man on top was being very still and was pinning Kauanui down; he was not pummeling Kauanui.

Baltazar testified that when he looked out the window while his wife was calling 911, he saw four guys beating on someone. He described as a "scrum," which is a rugby term for "everyone on top of someone." The four men were "either kicking or punching or elbowing or kneeing" someone who turned out to be Kauanui. The entire group was moving and ended up falling down by a palm tree. According to Baltazar, Kauanui was

10

able to pull himself up, and as he did so, "someone wearing a black baseball cap, a black opened shirt, short-sleeve shirt, black shorts, black shoes and white socks came flying out of there and cold cocked [Kauanui]. And that's when he went down onto the ground. And as he was going down, that individual was kicking, and so was — there was another gentleman without a shirt on, a blond-haired guy who ended up losing his tooth, who was also kicking [Kauanui]."

Baltazar testified that Grosso ran over screaming hysterically and "started kicking them to get off." After kicking the "blond guy" and she went around the corner and pounded on the Explorer and tried "to kick the light in." She then ran back to Kauanui who was down with a pool of blood around his head. Baltazar saw "a couple of other guys there that seemed like . . . they were administering to [Kauanui] . . . or trying to help him or something." According to Baltazar, the man in the black shirt and black shorts came "flying out from that same corner again . . . and threw these two guys off [Kauanui] that were down trying to help him." Baltazar identified the man wearing black as Cravens. He testified that after throwing the two men off Kauanui, Cravens checked Kauanui's pulse and started running away. At about the same time, the police arrived and the Explorer "came flying around the corner, and the door was open, and [Cravens] dove — because the car stopped there. He dove in."

Kauanui's friend Dylan Eckardt testified that a little after midnight on the night of the incident, he and his then girlfriend, Karen Loftus, were at a friend's house and Kauanui called him from the Brew House. Kauanui told Eckardt there had been an

11

altercation at the Brew House and that he was leaving. He asked Eckardt to meet him at his house.

At 1:31 a.m., Eckardt called Kauanui from Loftus's car as she was driving to Kauanui's house. Kauanui sounded frantic, screaming, "Hurry up and get over here." He told Eckardt, "I've got beef at my house." Eckardt construed that statement to mean there was some kind of problem at Kauanui's house. Kauanui's phone then went dead and a few minutes later Eckardt and Loftus arrived at his house. Eckardt saw a few men circled around someone on the ground in the intersection by Kauanui's house and another man standing nearby. One man kicked the encircled person. Eckardt got out of the car and started yelling and cursing at the men and asking where Kauanui was. He then saw that Kauanui was the person on the ground.

Grosso ran toward Eckardt swinging a shoe, apparently not recognizing him. He pushed her aside and as he yelled Kauanui's name, he saw Kauanui stand up. Kauanui, who was on the street, turned toward Cravens, who was standing near Kauanui on the curb. Kauanui said, "What the fuck. What the fuck. What the fuck. Why are you at my house?" In response, Cravens hit him once with a hard punch to the side of his head, causing him to go down and hit his head on the ground.

The ambulance took Kauanui to Scripps Memorial Hospital in La Jolla. Kauanui underwent two surgeries to relieve pressure in his brain — a craniotomy and a craniectomy. Both procedures are generally performed on patients with life-threatening brain injuries causing high pressure in the brain. The pressure in Kauanui's brain remained very high despite the surgeries and various medications he was given, and his

12

brain function continued to deteriorate. He was pronounced brain dead on May 28, 2007, and he died the next day.

The medical examiner who performed Kauanui's autopsy testified that Kauanui suffered a severe fracture that started on the left back of his head at the point of impact, extended through one of the thickest areas of the skull that holds the ear canal, and ended just behind where the eyes are on the skull. The medical examiner had seen similar injuries in motor vehicle crash cases and where people "have been impacted with some sort of instrument, hammer, baseball bat, tire iron." There was bruising on the undersurface of the brain on the impacted left side and contrecoup injury on the right side, opposite the point of impact. Other abrasions on Kauanui's body were "medically insignificant." The cause of death was a single impact, blunt-force head injury. The medical examiner did not see evidence that Kauanui had been punched repeatedly in the face or showing on which side of the face Cravens had punched him. A toxicology examination of blood obtained from the hospital close to the time Kauanui was admitted revealed a blood alcohol level of .17 and metabolites of marijuana in his system.

Kristin Link was a friend of both Kauanui and Cravens. On the morning of May 24, 2007, her mother called her and told her Kauanui had been in a fight with Cravens and was in the hospital. Link was confused as to why Kauanui and Cravens would get into a fight, because she thought they were friends. She called Cravens's cell phone and asked him if he had been in a fight with Kauanui. Cravens said, "I would hardly call it a fight. I punched him out." Cravens told her Kauanui had spilled a beer on House, the two got into an argument, and they went over to Kauanui's house where Kauanui and

13

House fought. Cravens said Kauanui was winning, so he (Cravens) pulled House away from the fight and punched Kauanui. Cravens was not remorseful until Link told him that Kauanui was in the hospital at the end of the conversation, at which point Cravens cried.

Nicole Sparks was friends with Cravens and Hendricks and had dated Kauanui. On May 24, 2007, she heard at her high school that Kauanui had been in a fight with Cravens the night before. She called Hendricks between 11:00 and 11:30 a.m. He answered his phone and as she spoke with him, she saw him drive by the high school with Cravens in the passenger seat. She asked Hendricks if there had been a fight between Cravens and Kauanui. She heard Cravens laugh and say, "We put him to sleep."

Defense Evidence

Yanke and Hendricks testified for the defense. Cravens did not testify. Yanke[3] testified that he was friends with Kauanui and that he and Cravens had attended gatherings at Kauanui's house. He drove his Explorer to the Brew House the evening of May 23, 2007, accompanied by Cravens, Hendricks, House, and Sean Keller. They met Osuna at the Brew House. Yanke was not aware of any controversy between House and Kauanui before he left the bar at about 1:00 a.m. After leaving the bar, Yanke and the group he was with went to Kauanui's house in Yanke's Explorer because House had

---

[3]     Yanke pled guilty to involuntary manslaughter in connection with Kauanui's homicide and misdemeanor battery in connection with Count 7, discussed *infra.*

14

received a phone call from Kauanui, who wanted to fight House one on one.  Osuna drove because Yanke was intoxicated.

When they arrived at Kauanui's house, Yanke saw Kauanui through a bay window of the house, pacing back and forth with his shirt off and talking on his cell phone.  He appeared to be "very agitated, moving violently back and forth."  When Kauanui saw House exit the Explorer, he charged out of the front door, jumped over the front gate, and engaged in a fight with House in the middle of the street.  House tackled Kauanui and the two wrestled on the ground for a while with neither dominating the other.  At some point Grosso drove up, got out of her car, and started kicking House in the head with a "stomping motion," which caused him to retreat a bit.  Hendricks pulled Grosso off House and told her she did not know what was going on.

House said, "I'm done" several times and started looking for something on the ground.  According to Yanke, Kauanui upper cut House three to five times, while he (House) repeatedly said, "I'm done."  Cravens then pushed Kauanui and said, "Get off him.  He's done.  He's done.  Get off him."  Cravens "backed away from the situation" and Kauanui charged him, saying "Why did you guys come over here?  Why are you guys doing this?"  Kauanui came within inches of Cravens's face and started to swing at him with his right arm.  Cravens countered with his left arm and struck Kauanui in the jaw.  Kauanui "buckled up, became stiff, and fell directly back and hit his head on the pavement."

The sound of Kauanui's head hitting the ground was "very gruesome" and Cravens looked shocked and worried about what had just happened.  Grosso was screaming and

"saying a lot of stuff," and a neighbor was saying the cops were coming. Yanke and Cravens got into Yanke's car and Yanke drove to his mother's house. He hit a retaining wall on the way and parked the car in a church parking lot by the house. When they arrived at the house, Hendricks was outside in the alley. The three spent the night at the house. Cravens's left hand was hurting and Yanke gave him some frozen peas to put on it.

Hendricks related a similar version of the events leading to Kauanui's death. He testified that he first heard of the controversy between House and Kauanui when he and Yanke left the bar and met House, Cravens, and Osuna in the parking lot. He was informed that House and Kauanui had talked on the phone and wanted to fight each other. Hendricks got into Yanke's Explorer with Yanke, Cravens, House, and Osuna, who drove because he had not been drinking, and the group traveled the short distance to Kauanui's house.

House called Kauanui when they arrived to let him know they were there and the two agreed to fight. Hendricks saw Kauanui through the picture window next to the front door of his house talking to House on the phone with his shirt off. After exiting the Explorer, Cravens, Yanke, Hendricks, and Osuna stood on a curb as House met Kauanui in the middle of the street. House took Kauanui down with a wrestling maneuver and the fight started as a wrestling match. Eventually, they both stood up, but because House was getting up slower than Kauanui, Kauanui punched House twice in the face before he got to his feet. They ended up back on the ground with House on top of Kauanui. Grosso drove up, got out of her car, and started kicking House in the back of the head.

16

Hendricks grabbed her and pushed her away, saying "You don't know what the fuck's going on."

When Hendricks turned back to look where House and Kauanui had been fighting, he saw House on all fours looking disoriented and saying, "I got to find my tooth. Where's my fucking tooth?" Kauanui then ran up to House and swung at him, but did not connect a punch. Cravens or Osuna pushed Kauanui and said, "It's fucking over with," referring to the fight between Kauanui and House. House was mumbling, "You got me. You got me. It's over." Kauanui and Cravens began exchanging words back and forth, "Hawaiian style." Each was telling the other he could "fuck him up." They started five to ten feet apart but Kauanui walked up to Cravens and started talking "in his face" and "talking with his hands in [Cravens's] face." About three to five seconds later, Cravens hit Kauanui on the lower chin with his left hand. Kauanui's "head went up and down, and he was knocked out cold and fell back on his head."

The only kicking Hendricks saw was Grosso kicking the back of House's head. Yanke and Cravens tried to grab House to get him back in Yanke's car, but he became violent and started throwing punches, saying "I need my fucking tooth." Hendricks and Osuna left the scene on foot as the police were arriving. They walked to Yanke's house and Hendricks spent the night there. After they went into the house, Cravens bragged and expressed surprise about knocking Kauanui out with one punch from his left hand. Cravens's mother testified that Cravens is right-handed.

17

*Criminal Threat (Count 1 — Victim Eric Sorensen)*

In July 2005, Eric Sorensen was living in a house on Forward Street in La Jolla with Brian Walsh. In early July 2005, his mother, his girlfriend, and his girlfriend's mother were visiting and staying at the house. On July 4, 2005, Sorensen saw a verbal confrontation outside the house between Osuna and Walsh.[4] Osuna left and ten minutes later a truck drove up to the house. Erik Wright got out of the truck and punched Walsh in the face. Sorensen took Walsh to the emergency room and a less than a week later, Walsh underwent reconstructive surgery for the entire side of his face.

Wright testified that on the day of the incident, his mother drove by Sorensen and Walsh's house on her way to pick him up and Walsh sprayed her vehicle (a Toyota truck) with a hose.[5] When she drove back by the house after picking up Wright, Walsh sprayed her truck again. Wright then got out of the truck and confronted Walsh, who was drunk and belligerent. Walsh threw a punch at Wright, and Wright countered with a punch that hit Walsh in the face. Walsh and Sorensen's neighbor, Eduardo Apodaca, testified that Wright got back into the truck and drove away. Apodaca tried unsuccessfully to read the truck's license plate.

---

[4]    Sorensen testified that the confrontation was between Walsh and "Orlando Wright." Sorensen presumably was referring to Orlando Osuna, since Osuna and Erik Wright are stepbrothers and live in the same home.

[5]    Sorensen and his neighbor, Eduardo Apodaca, who witnessed the July 4th incident both testified that the vehicle was a golden Toyota truck.

18

On July 8, 2005, Apodaca, his wife, and his brother Fernando were having dinner on their deck when they saw the same Toyota truck drive by fast and heard someone scream, "fucking kooks." The Apodacas told Sorensen what had just happened. Sorensen immediately got on his motorcycle while Fernando got in his truck, and the two pursued the Toyota truck to get its license plate number. Sorensen got the number, returned to his house, and called the police.

Wright testified that he was driving the gold Toyota truck and saw Sorensen and Fernando following him as he pulled up to his house. Thinking "they were trying to get revenge and kick my ass," he turned around and drove down some side streets. He saw they were still following him, so he called his friend Nino Nunziante in Pacific Beach and drove to his house, where he picked up Nunziante, Reed Decker, and Cravens. His plan was to drive with his friends to where Sorensen and Apodaca lived to confront them and ask them what they were doing at his house.

According to Wright, they pulled up to Sorensen and Walsh's house and Walsh and his friends were there "calling us pussies and trying to provoke a fight." Wright's girlfriend also arrived on the scene because Wright had called her on the way over. Wright testified that "she stopped me and was going crazy on me and pulled me into her car." He further testified that he left the area with her in her car, leaving his truck parked at the scene, and "didn't see anything else."

Sorensen testified that less than five minutes after he and Fernando returned from getting the license plate number from Wright's truck, the truck pulled up and four to six

19

shirtless men jumped out and ran toward his house yelling.[6]  Wright led the group with two men on either side of him and one behind him.  Sorensen was in the house and was closing a metal screen door, but Wright grabbed it out of his hand, pulled it open, and tried to grab him.  Sorensen slammed the front wood door and held it with his foot because he could not get it shut enough to lock it.  As he held the door with his foot, the attackers were "banging on the house and kicking things over."  Apodaca testified that they knocked over Sorensen's motorcycle.  Sorensen heard Wright yell that he was "going to fucking kill" him.  The group left after Sorensen yelled through the door that he was calling the police.  Sorensen felt that his life and the lives of those around him were immediately threatened.  During the next three weeks he spent in San Diego completing flight training, he worried whether "these people that lived two blocks up the street [were] going to come bash our house in and kill us."

At a live line up in 2008, Sorensen identified Cravens as the person he saw with Wright about two weeks after the July 8, 2005 incident.  He was not able to identify any faces from the incident except Wright's, but remembered someone there having a build similar to Cravens's.

---

6    Apodaca testified that the men wore hooded sweatshirts and one had a bat.  He saw them bang on the walls of Sorensen's house and hit the door with the bat, in addition to knocking over Sorensen's motorcycle.

*Assault With Force Likely to Produce Great Bodily Injury*
*(Count 5 — Victim Chris Jarrett)*

In August 2006, August Essner, Chris Jarrett, and Jarrett's girlfriend Shannon O'Neill were at Windansea Beach in La Jolla in an area the locals call Pink Wall. They went there to skimboard and enjoy the beach. While Essner and Jarrett were taking turns using Essner's skimboard, two young men holding beer bottles approached them and asked what they were doing there. They told Essner and Jarrett they did not like skimboarding and to get off their beach and "go home." Essner or Jarrett responded, "This isn't your beach. We're not going anywhere." Essner said, "Well, what do you guys want to do about it? Do you guys have a problem with it? What's going on?"

The men suddenly threw their beer bottles at Jarrett and Essner, and one of the bottles struck and cut Jarrett in the shoulder. Jarrett grabbed one of the men as the other swung at Essner, and a fight ensued. As Jarrett and Essner were fighting the men "two on two," five to seven men, including Cravens, whom O'Neill recognized from school, ran up to the scene and joined in the fight. Cravens punched Jarrett, put him in a headlock and poured sand in his face. Jarrett was eventually taken to the ground with four or five men on top of him and someone stomped him on the side of his face, pushing him into the sand. O'Neill intervened by trying to pull people off Jarrett and punching his attackers. Jarrett managed to get to his feet and began fighting one-on-one with Cravens. O'Neill tried to step in but Cravens hit her in the face, causing her to fall into the sand. Jarrett ran away and O'Neill continued to hit Cravens in the stomach and slap him in the face. Cravens said to his friends, "Get this bitch off of me or I'm going to hit her again."

21

O'Neill then saw members of Cravens's group "trying to steal our stuff." They grabbed a cooler and Jarrett's backpack and O'Neill tried to get those items back from them. They dropped the cooler and threw Essner's skimboard in the ocean but took the backpack with them. One of the men, who had blood coming out of his mouth, walked up to O'Neill and spit blood in her face. As the group was leaving, O'Neill walked after them and yelled, "Why did you guys do this? What was the point of this?" Cravens answered, "This is La Jolla. This is my town. You guys don't belong there."

As a result of the fight, Jarrett suffered a split lower lip, a laceration on his shoulder from the beer bottle, and bruising on his ribs and back. He also had footprints on his back.

*Misdemeanor Battery (Count 6 ⸺ Victim Elisabeth S.)*

In October 2007, Elisabeth S. was 17 years old and a junior at La Jolla High School. Her mother was in Australia and her father stayed at a downtown hotel one night so she could have the house to herself for a small social gathering. She invited one friend to her house, but her friend invited a lot more people and by 9:30 p.m. there were about 100 people at her house.

When some people started feeding her dogs beer "and stuff like that," Elisabeth got everyone out of the living room and onto a deck. She became angry and wanted everyone to leave through a back gate. She got most of the people out, but some became upset and threw pots from a balcony onto the sidewalk and cars below and told her they were not going to leave. Elisabeth yelled at the last few to leave, including Cravens, telling them they were not invited and needed to get out. Cravens responded by hitting

22

her once in the chest and once on the chin.  The hit to the chin was not full force but left a welt.  Cravens and the people he was with left when a neighbor confronted them and told them they needed to leave.

*Assault With Force Likely to Produce Great Bodily Injury*
*(Count 7 — Victim Logan Henry)*

On December 31, 2006, Lauren Kelly rented a "party limo bus" for New Year's Eve, which was also Kauanui's birthday.  The bus picked up Kelly and others at her house and made additional stops throughout the evening to pick up other people, including Kauanui, his younger brother Nigel Kauanui, Cravens, Yanke, Osuna, Wright, and Nunziante.  Eventually, there were between 40 and 60 people on board the bus.

The same night, Romy Segall was having an "invitation-only" New Year's Eve party for her closest friends at her parents' home in La Jolla.  About 80 invited guests attended the party but many left after midnight.  By 12:45 a.m., there were 30 to 40 guests remaining according to one witness and about 15 according to another.

Around that time, Segall's boyfriend, Joseph Heinrich, was outside saying goodbye to someone and Kelly's party bus pulled up in front of the house.  Three men got off the bus and were acting rowdy.  Heinrich told them "to get the fuck out of here because the party's over."  One of the men took his shirt off and walked up to Heinrich as the other two stood behind him.  He asked Heinrich who he thought he was talking to him like that and said, "You want to go[?]  You want to go right now[?]"  Heinrich backed up, went back inside the house, and bolted the door as other people started to "pile off" the bus.

23

Heinrich went to the back yard asked Logan Henry for support in telling the people from the party bus they were not welcome. Henry walked around the side of the house to the front yard holding a bottle. Someone slapped the bottle out of his hand and punched him on the side of his face. The punch knocked his glasses off and caused him to fall on top of someone, and he began hitting that person in the face. The person he was hitting said, "Get this f'ing person off of me." Someone then kicked Henry four times in the face. Henry's girlfriend and Segall stepped in between Henry and his assailants and Henry was able to stand. When he got up, Cravens looked him in the face and said he was going to "f'ing kill" him. Henry responded, "Do it, you know. Bring it."

Meanwhile, a group of about seven men inside the house decided to go outside to get the people from the bus to leave while Heinrich called the police. They were immediately accosted by men from the bus and a melee ensued. The fight ended when Heinrich announced he had called the police. Most of the people from the bus scattered and re-boarded the bus, which then drove away.

Henry suffered light bruising to his eyes and a bloody nose, and his shirt was ripped and completely covered in blood. He testified that the front yard of Segall's house was "mangled." Sprinkler heads were broken and "the whole lawn . . . looked like a rugby tournament had been played on it."

*Assault With Force Likely to Produce Great Bodily Injury*
*(Count 10 — Victim John Hlavac)*

On February 4, 2007, John Hlavac left a Super Bowl party in La Jolla on foot between 9:00 and 9:30 p.m. He had been drinking and was intoxicated. He had just

24

crossed a street to go into a 7-Eleven store when a car abruptly stopped near him. He turned around and saw that Avi Wasserman was driving the car, Cravens was riding in the front seat, and Osuna was in the back seat. Hlavac was familiar with Cravens from school and they did not like each other.

Someone in the car yelled something and Hlavac responded, "Fuck you." Cravens and Osuna quickly got out of the car and approached Hlavac. Cravens threw a punch at Hlavac's head. Hlavac dodged the punch and hit Osuna, who was getting ready to swing at him. Then someone punched Hlavac hard enough to knock him to the ground. He covered his face so he would not "get stomped on." At one point when he was on the ground, Osuna punched him in the face above his right eyebrow. He received a total of about five "hard hits" during the fight, which lasted about one minute. Cravens and Osuna jumped back in the car and drove off when someone from a taco shop across the street came out and yelled at them in Spanish.

When Hlavac returned home, his hand was bleeding and his eye was swollen. He did not intend to call the police, but one of his parents called them and he provided a report to an officer that night. A few days later he told another officer who came to see him that he did not want to pursue charges.

*Assault With Force Likely to Produce Great Bodily Injury*
*(Count 11 — Victim Michael Johnson)*

On May 8, 2007, Christopher Horning and Michael Johnson, an acquaintance of Horning's from work, had dinner and drinks in Pacific Beach and then drove in Horning's car to a bar in La Jolla called The Shack to have a beer before going home. They arrived

25

sometime between 11:00 p.m. and midnight and parked next door to The Shack, across the street from a 7-Eleven store.

When they got out of the car, they saw a group of three or four males and two females crossing the street. The girls were laughing, and Horning thought he heard one of them imitate the way the comedic character Borat says the word "nice" throughout the Borat movie that was out at the time. Horning said "the same thing right back to her." He testified that it was a "[c]ommon thing to do at the time. Everybody . . . was saying [it] everywhere."

In response, Cravens turned toward Horning and Johnson and said something to the effect of, "This is none of your fucking business. Stay out of it." Cravens then approached Horning and Johnson. Horning told him they were just having fun and not trying to start a fight. According to Horning, Johnson closed the car door and came around the front of the car saying "Whoa. Whoa. Whoa," with his hands raised. He then said, "We're not trying to start a fight, or peace or something like that." Johnson moved closer to Cravens and suddenly, without warning, Cravens "stepped into" him and "sucker punched" him in the face with full force.

Johnson stepped back, dazed and shocked, and Horning said something to the effect of, "Whoa. Stop. No. No. No fighting." One of the males with Cravens warned Horning to "stay out if it." Cravens ignored Horning and taunted Johnson, saying something to the effect of, "Come on. What do you got?" Cravens then stepped forward and punched Johnson again full force in the face, causing Johnson to fall to the ground. As Johnson sat on the ground with his legs bent at the knees, his feet on the ground in

26

front of him, and his arms outstretched behind him to support his weight, Cravens backed up about six feet and continued to taunt him. Cravens then stepped forward and punched him a third time in the face with an underhand swing. Blood came out of Johnson's nose and mouth and his nose appeared to be broken.

Horning yelled, "You're going to jail. I got your license plate number." Someone in Cravens's group said, "Let's get out of here." Cravens told the two girls to get in the car and leave. The girls drove off as he ran down an alley behind the 7-Eleven store with the other males in the group. The police and an ambulance arrived on the scene, and Horning rode with Johnson in the ambulance to the hospital.

The emergency room physician who examined Johnson noted injuries consistent with a probable broken nose and possible other facial fractures. He recommended a CAT scan of Johnson's head and face, but Johnson left the emergency room before any tests were done. Johnson assumed his nose was broken because it had been broken before. His face, eyes, and ears were swollen and there was a slight bruise on his back as a result of his falling onto the concrete. His facial injuries were painful and it took about two weeks for the initial swelling to go away, and about another month for the swelling to completely disappear and his face to return to normal. Johnson's nose felt more deviated after the assault, and he eventually began to have pain in his ear when he slept on his left side. He thought pain was possibly due to drainage coming down from the nose and deviated septum. However, he had previously broken his nose "once or twice in baseball," and acknowledged that the deviated septum could be from his other injuries.

27

The morning after the assault, Horning returned to the scene to retrieve his car. He spoke to an employee of The Shack named Pete, who told Horning he knew who had assaulted Johnson. Pete accompanied Horning to La Jolla High School to look at yearbooks. Horning identified Cravens as Johnson's assailant from viewing photographs of Cravens in yearbooks from 2002 through 2004.

On May 10, 2007, Cravens sent the following MySpace message: "What the fuck. When are we going to chill[?] I can't go to the Shack for a while because I murdered someone. Ha, ha, ha, ha. No biggie. Call me up and let's get krunk."[7]

DISCUSSION

I.

*Failure to Instruct on The Theory of Voluntary Manslaughter Articulated in Garcia*

Cravens contends that court committed reversible error by failing to sua sponte instruct the jury on the theory of voluntary manslaughter articulated in *Garcia*, *supra*, 162 Cal.App.4th 18.

A trial court errs if it fails to sua sponte instruct on all theories of a lesser included offense that are supported by substantial evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) The Court of Appeal in *Garcia* held that an unintentional killing, without malice, during the commission of an "inherently dangerous felony" constitutes at

---

7       According to Cravens's opening brief, "krunk" likely means "crazy drunk."

28

least voluntary manslaughter. (*Garcia*, *supra*, 162 Cal.App.4th at p. 31.)[8] Accordingly, Cravens contends the trial court in this case should have sua sponte instructed the jury that if it found he committed the inherently dangerous felony of assault with force likely to produce great bodily injury but did so without implied malice, it could convict him of voluntary manslaughter.

In *Bryant*, this court reversed a second degree murder conviction on the ground the trial court prejudicially " 'erred in failing to instruct the jury on the lesser included offense of voluntary manslaughter, based on the theory articulated in *Garcia*.' " (*Bryant*, *supra*, 56 Cal.4th at p. 964.) Reversing this court, the Supreme Court disapproved the *Garcia* theory of voluntary manslaughter and clarified that an essential element of voluntary manslaughter is either an intent to kill or a conscious disregard for life, the latter being the mental component of implied malice. (*Bryant*, *supra*, 56 Cal.4th at p. 968.) Thus, "[a] defendant commits voluntary manslaughter when a homicide that is committed either with intent to kill or with conscious disregard for life—and therefore would normally constitute murder—is nevertheless reduced or mitigated to manslaughter." (*Ibid.*) The *Bryant* court concluded that "[b]ecause a killing without malice in the commission of an

---

8    The *Garcia* court recognized that "[i]n most instances, if the felony was inherently dangerous, the defendant could be found guilty of second degree murder under the [second degree] felony-murder doctrine without proof of implied malice . . . ." (*Garcia*, *supra*, 162 Cal.App.4th at p. 28.) *Garcia* addressed the issue of what crime is committed when the "merger" doctrine recognized in *People v. Ireland* (1969) 70 Cal.2d 522, 539, precludes application of the second degree felony-murder rule to an unintentional killing that occurs during the commission of a felony, such as assault, that is an integral part of the homicide.

29

inherently dangerous assaultive felony is not voluntary manslaughter, the trial court could not have erred in failing to instruct the jury that it was."[9]  (*Bryant*, *supra*, 56 Cal.4th at p. 970.)

*Bryant* establishes that the *Garcia* theory of voluntary manslaughter—i.e., that an unintentional killing committed without malice during the commission of an inherently dangerous felony constitutes voluntary manslaughter—is not valid in California. Accordingly, the trial court did not err in failing to instruct the jury on that theory.

## II.
### *Joinder of Counts*

Cravens contends the court prejudicially erred by denying his motion to sever trial of the second degree murder count from trial of the other counts.[10]

---

[9]     The *Bryant* court declined to address the defendant's "alternative contention that, because assault with a deadly weapon is not an inherently dangerous felony, the trial court erred in failing to instruct the jury on the theory of involuntary manslaughter recognized in [*People v. Burroughs* (1984)] 35 Cal.3d 824."  (*Bryant*, *supra*, 56 Cal.4th at pp. 970-971.)  In *Burroughs*, the California Supreme Court held that an unintentional homicide committed in the course of a noninherently dangerous felony may support a conviction of involuntary manslaughter, if that felony is committed without due caution and circumspection.  (*Burroughs*, at p. 835.)  In his opening brief, Cravens assumes that assault with force likely to produce great bodily injury is an inherently dangerous felony.

[10]     In addition to the counts on which Cravens was convicted, the following counts that were either dismissed or on which he was acquitted were tried to the jury:
        Count 2 (not guilty verdict) — assault with force likely to produce great bodily injury (§ 245, subd (a)(1)) with enhancement for infliction of great bodily injury (§ 12022.7) (victim Eric Pardee):  On October 14, 2005, Eric Pardee attended a party in La Jolla with some friends.  He was drunk and asking if anyone had seen his ex-girlfriend at the party and someone said, "She's fucking that guy over there in the other room."  Pardee looked around and asked, "Who the fuck said that?"  Cravens responded, presumably stating he had made the comment.  Later, when Pardee was outside and about to leave the party, three men approached him.  He had a "blotchy" memory of falling, but

Under section 954, "[a]n accusatory pleading may charge two or more different offenses connected together in their commission, . . . or two or more different offenses of the same class of crimes or offenses, under separate counts, . . . provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately."

"For purposes of joinder, offenses are deemed to have been 'connected together in their commission' where there was a common element of substantial importance in their commission, even though the offenses charged did not relate to the same transaction and were committed at different times and places and against different victims. [Citations.] Similarly, within the meaning of section 954, offenses are 'of the same class' if they

the next thing he remembered clearly was being on a couch in his home later that night. He suffered broken bones in his face but could not identify who hit him.

    Count 3 (§ 1118.1 motion to dismiss granted) — assault with force likely to produce great bodily injury (§ 245, subd (a)(1) (victim Ryan Granger): On New Year's Eve of 2005, Ryan Granger was intoxicated at a party in Pacific Beach. Cravens was at the party and was "kind of just horse playing with some girl" when he bumped into Granger, causing Granger's beer to spill. Granger was startled and said something to the effect of, "Dude, what's up?," and also uttered some profanity. Cravens "got in [Granger's] face," demanded an apology, and asked Granger if he wanted to start the new year off with a black eye. About five minutes later, Cravens "sucker-punched" Granger in the nose from the side. Granger's nose felt painful and "messed up" for about two months.

    Count 8 ((not guilty verdict) — assault with force likely to produce great bodily injury (§ 245, subd (a)(1) and Count 9 (not guilty verdict) — battery (§ 242) (victims J. B. Haskett and Jennifer Haskett): During the melee that occurred outside Romy Segall's New Year's Eve party after the party bus arrived, Osuna sneaked around a car that J. B. Haskett was leaning against and punched him in the side. Haskett's wife Jennifer saw the punch and screamed at Osuna "up in his face," asking him what he was doing and why he was there. Osuna stared at her for a moment and then pushed her head back with his hand, causing her to take a couple of steps back and her head to "yank[]back."

31

possess common characteristics or attributes." (*Aydelott v. Superior Court* (1970) 7 Cal.App.3d 718, 722; *People v. Lucky* (1988) 45 Cal.3d 259, 276.)

In *People v. Soper* (2009) 45 Cal.4th 759 (*Soper*), the California Supreme Court noted significant distinctions between joinder of *charged* offenses and admission of evidence of *uncharged* offenses. As the proponent of evidence of uncharged offenses, the prosecution bears the burden of persuading the court that the probative value of the evidence, which is generally inadmissible, outweighs its prejudicial effect. (*Id.* at pp. 772-773.) However, in the context of properly joined offenses, the burden is reversed. "The prosecution is entitled to join offenses under the circumstances specified in section 954. The burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried. [Citations.] When the offenses are [properly] joined for trial the defendant's guilt of all the offenses is at issue and the problem of confusing the jury with collateral matters does not arise. The other-crimes evidence does not relate to [an] offense for which the defendant may have escaped punishment. That the evidence would otherwise be inadmissible [under Evidence Code section 352] may be considered as a factor suggesting possible prejudice, but countervailing considerations [of efficiency and judicial economy] that are not present when evidence of uncharged offenses is offered must be weighed in ruling on a . . . motion [to sever properly joined charges]. The burden is on the defendant therefore to persuade the court that these countervailing considerations are outweighed by a substantial danger of undue prejudice." (*People v. Bean* (1988) 46 Cal.3d 919, 938-939, fn. omitted (*Bean*); *Soper*, *supra*, 45 Cal.4th at p.773.)

In *Soper*, the California Supreme Court explained that "[n]ot only is the burden allocated differently in cases involving properly joined charges as compared with cases involving the introduction of uncharged misconduct, but the nature of the abuse of discretion standard—and the ensuing method utilized to analyze prejudice, undertaken to determine whether a trial court abused its discretion in a specific case—also are significantly different from what is employed in determining whether a trial court erred in allowing the introduction of evidence of uncharged misconduct." (*Soper*, *supra*, 45 Cal.4th at p. 774.) To establish that a trial court abused its discretion in denying a motion to sever properly joined charges, a defendant must make a *clear showing of prejudice*, which is a stronger showing of prejudice than would be required to exclude evidence of other crimes in a severed trial. (*Ibid.*) The denial of the severance motion amounts to a prejudicial abuse of discretion only if it exceeds the bounds of reason. (*Ibid.*)

Further, the method used to analyze prejudice is significantly different from that used in reviewing the admission of evidence of uncharged misconduct. "[A]mong the 'countervailing considerations' present in the context of severance—but absent in the context of admitting evidence of uncharged offenses at a separate trial—are the benefits to the state, in the form of conservation of judicial resources and public funds. [Citation.] . . . [T]hese considerations often weigh strongly against severance of properly joined charges." (*Soper*, *supra*, 45 Cal.4th at p. 774.)

Our determination of whether the trial court abused its discretion in denying a motion to sever properly joined charges is based on the record before the trial court when it made its ruling and the particular circumstances of the case. (*Soper*, *supra*, 41 Cal.4th

33

at p. 774.) However, " 'certain criteria have emerged to provide guidance in ruling upon and reviewing a motion to sever trial.' " (*Ibid.*)

"First, we consider the cross-admissibility of the evidence in hypothetical separate trials. [Citation.] If the evidence underlying the charges in question would be cross-admissible, that factor alone is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges. [Citation.] Moreover, even if the evidence underlying these charges would *not* be cross-admissible in hypothetical separate trials, that determination would not itself establish prejudice or an abuse of discretion by the trial court in declining to sever properly joined charges. [Citation.] Indeed, section 954.1 . . . codifies this rule—it provides that when . . . properly joined charges are of the same class, the circumstance that the evidence underlying those charges would not be cross-admissible at hypothetical separate trials is, standing alone, insufficient to establish that a trial court abused its discretion in refusing to sever those charges.[11]" (*Soper*, *supra*, 45 Cal.4th at pp. 774-775.)

If a reviewing court determines the evidence underlying properly joined charges would *not* be cross-admissible, it then considers " 'whether the benefits of joinder were sufficiently substantial to outweigh the possible "spill-over" effect of the "other-crimes"

---

11    Section 954.1 provides: "In cases in which two or more different offenses of the same class of crimes or offenses have been charged together in the same accusatory pleading, or where two or more accusatory pleadings charging offenses of the same class of crimes or offenses have been consolidated, evidence concerning one offense or offenses need not be admissible as to the other offense or offenses before the jointly charged offenses may be tried together before the same trier of fact."

evidence on the jury in its consideration of the evidence of defendant's guilt of each set of offenses.' [Citations.] In making *that* assessment, [the reviewing court considers] three additional factors, any of which—combined with [the] earlier determination of absence of cross-admissibility—might establish an abuse of the trial court's discretion: (1) whether some of the charges are particularly likely to inflame the jury against the defendant; (2) whether a weak case has been joined with a strong case or another weak case so that the totality of the evidence may alter the outcome as to some or all of the charges; or (3) whether one of the charges (but not another) is a capital offense, or the joinder of the charges converts the matter into a capital case." (*Soper*, *supra*, 45 Cal.4th at p. 775.) The reviewing court then balances the potential for prejudice to the defendant from a trial of properly joined charges against the countervailing benefits to the state, bearing in mind that the state's interest in joinder gives a trial court broader discretion to deny a motion to sever properly joined charges than it has to admit evidence of uncharged offenses in a separate trial. (*Id.* at p. 775 & fn. 7; *Bean*, *supra*, 46 Cal.3d at pp. 935-936.)

We conclude the court did not prejudicially err in denying Cravens's motion to sever the other counts from the murder count. Preliminarily, we view the counts as properly joined because they were of the same class and connected together in their commission within the meaning of section 954. Cravens contends that the count of making a criminal threat (Count 1) was improperly joined because it is not in the same class as the other *assaultive* offenses, and the criminal threat and other offenses were not connected together in their commission. As noted, the term "same class of crimes or offenses" in section 954 refers to offenses that possess common characteristics or

35

attributes, and courts have interpreted the term broadly.  (See *People v. Grant* (2003) 113 Cal.App.4th 579, 586; [counts of burglary, concealing stolen property, and possession of property with a removed serial number were properly joined as crimes against property]; *People v. Thomas* (1990) 219 Cal.App.3d 134, 139-140 [charges of attempted murder, robbery, and ex-felon in possession of a firearm properly joined as belonging to the class of assaultive crimes against the person]; *People v. Lindsay* (1964) 227 Cal.App.2d 482, 492 [charges of kidnapping, robbery, and assault with a deadly weapon were properly joined as offenses against the person, and burglary with intent to commit those offenses was properly joined as possessing a common element of substantial importance with the other offenses].)  Further, the language "connected together in their commission" in section 954 reflects legislative intent for a very broad test for joinder of offenses.  (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1217-1218.)

The crime of making a criminal threat is in the same class of offense as assault because both are crimes against the person, regardless of how they are classified in the Penal Code.[12]  (See *Doe v. Saenz* (2006) 140 Cal.App.4th 960, 987 ["crimes against the person" generally refers to offenses in which the perpetrator uses *or threatens to use force*].)  The two offenses share the characteristic or attribute of subjecting the victim to the threat or fear of great bodily harm.  The criminal threat and assault counts in this case are also "connected together in their commission" within the meaning of section 954

---

[12]    Cravens points out that section 422 (making a criminal threat) is not located in Title 8 of the Penal Code (Crimes Against the Person), but rather is part of Title 11.5 (Terrorist Threats).

36

because they share a common element of substantial importance, namely, the intent to intimidate, terrorize, and bully the victims. (See *Alcala v. Superior Court*, *supra*, 43 Cal.4th at p. 1218 ["[T]he intent or motivation with which different acts are committed can qualify as a 'common element of substantial importance' in their commission and establish that such crimes were 'connected together in their commission.' "].)

Because the counts are properly joined under section 954, our determination whether Cravens was prejudiced by the joinder requires us to consider whether the evidence underlying the nonhomicide counts would be cross-admissible, under Evidence Code section 1101,[13] in a hypothetical separate trial of the second degree murder count. (*Soper*, *supra*, 45 Cal.4th at p. 774; *People v. Kraft* (2000) 23 Cal.4th 978, 1030.) "[T]here exists a continuum concerning the degree of similarity required for cross-admissibility, depending upon the purpose for which introduction of the evidence is sought: *'The least degree of similarity . . . is required in order to prove intent . . . .* In order to be admissible [for that purpose], the uncharged misconduct must be sufficiently similar to support the inference that the defendant " 'probably harbor[ed] the same intent in each instance.' [Citations.]" [Citation.]' [Citation.] By contrast, a higher degree of

---

13     Evidence Code section 1101 provides that "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).) But "[n]othing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . . ) other than his or her disposition to commit such an act." (Evid. Code, § 1101, subd. (b).)

similarity is required to prove common design or plan, and the highest degree of similarity is required to prove identity." (*Soper*, *supra*, 45 Cal.4th at p. 776, fns. omitted.)

We conclude the evidence underlying the other offenses would have been admissible in a hypothetical separate trial of the murder count on the issue of intent– specifically on the issue of whether Cravens acted with the intent to commit an assault or battery when he delivered the fatal blow to Kauanui, or acted in *self-defense* as he sought to prove at trial. (See *People v. Ewoldt* (1994) 7 Cal.4th 380, 402 [evidence of similar uncharged acts may be admissible to show intent by negating "accident or inadvertence or self-defense or good faith or other innocent mental state"].) We recognize that the trial court ruled the evidence would be cross-admissible as evidence of common scheme and plan under Evidence Code section 1101, subdivision (b), and evidence of habit or custom under Evidence Code section 1105,[14] and specifically ruled that the other counts were not to be considered on the issue of intent. However, the court and the parties referred to and were focused on "*intent to kill,"* rather than intent to assault or batter. The evidence that Cravens repeatedly reacted to confrontation with physical violence that was not self-defense, including frequently striking his adversary in the face, was admissible to negate the self-defense theory Cravens raised at trial—i.e., to show that Cravens did not act in self defense but rather *intended* to assault Kauanui by punching him in the face. Because

---

14    Evidence Code section 1105 provides: " Any otherwise admissible evidence of habit or custom is admissible to prove conduct on a specified occasion in conformity with the habit or custom."

the court correctly ruled the evidence was cross-admissible, it is immaterial whether the court made that ruling for the wrong reason. (See *People v. Brown* (2004) 33 Cal.4th 892, 901 [A judgment resting on admissible evidence will not be reversed because the trial court admitted it on a different theory, a mistaken theory, or one not raised below.].)

Regarding the trial court's cross-admissibility determination, it is well settled that a ruling on the admissibility of evidence under Evidence Code section 1101 or 1105 is reviewed for abuse of discretion. (*People v. Gray* (2005) 37 Cal.4th 168, 202; *People v. Hughes* (2002) 27 Cal.4th 287, 337.) Abuse occurs when the trial court's ruling "exceeds the bounds of reason, all of the circumstances being considered." (*People v. Giminez* (1975) 14 Cal.3d 68, 72; *People v. Kipp* (1998) 18 Cal.4th 349, 371.)

The court's ruling that the evidence of the other offenses was cross-admissible as evidence of a common scheme or plan or as evidence of habit or custom did not exceed the bounds of reason. Custom or habit involves a consistent, semi-automatic response to a repeated situation. (*People v. Memro* (1985) 38 Cal.3d 658, 681, fn. 22, overruled on another point in *People v. Gains* (2009) 46 Cal.4th 172, 181, fn. 2; *Webb v. Van Noort* (1966) 239 Cal.App.2d 472, 478.) To establish a common design or plan, "evidence of uncharged misconduct must demonstrate 'not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.' " (*People v. Ewoldt*, *supra*, 7 Cal.4th at p. 402.) "[T]he common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need

not be distinctive or unusual . . . . [I]t need only exist to support the inference that the defendant employed that plan in committing the charged [act]." (*Id*. at p. 403.)

The court could reasonably view Cravens's conduct underlying the nonhomicide counts as showing that he enjoyed assaulting people, that he particularly enjoyed punching them in the head and face, and that he engaged in the common scheme or plan of looking for or creating the least excuse to do so. Similarly, the court could reasonably view Cravens's punching people as a consistent, semi-automatic response to the repeated situation of his instigating or escalating confrontations with perceived adversaries, or even innocent victims, for the purpose of assaulting them.

Having concluded the evidence underlying the nonhomicide counts was cross-admissible on the murder count, we need not consider the other severance factors. (See *People v. Kraft*, *supra*, 23 Cal.4th at pp. 1030-1032; *People v. Bradford* (1997) 15 Cal.4th 1229, 1315-1316; *Frank v. Superior Court* (1989) 48 Cal.3d 632, 639 [determination that the charged crimes would be cross-admissible at separate trials can be dispositive of whether the court abused its discretion in denying severance].) However, *Soper* stated that " 'even if a trial court's ruling on a motion to sever is correct at the time it was made, a reviewing court still must determine whether, in the end, the joinder of

counts or defendants for trial resulted in gross unfairness depriving the defendant of due process of law.' " (*Soper*, *supra*, 45 Cal.4th at p. 783.)[15]

In his supplemental opening brief, Cravens contends the Supreme Court's opinion in this case demonstrates that joinder of the other offenses deprived him of due process of law. He focuses on the following paragraph from the Supreme Court's opinion: "Perhaps worst of all, defendant decked Kauanui with a sucker punch. The jury could reasonably have found that at the time defendant attacked, Kauanui posed no threat and was not behaving in an aggressive manner. Nonetheless, defendant 'came flying out' without warning and 'coldcocked' Kauanui. That defendant used a sucker punch here—and, thus, that defendant intended to catch Kauanui at his most vulnerable—was corroborated by his use of sucker punches in prior incidents, each of which the jury was allowed to consider as evidence of a common plan or scheme. [Citation.] The Court of Appeal not only failed to acknowledge that the fatal blow here was a sucker punch (or that it was inflicted with enough force to knock Kauanui unconscious before he even hit the pavement), but failed as well to grapple with the evidence tending to show defendant's pattern of using sucker punches to his advantage." (*Cravens*, 53 Cal.4th at p. 509.)

Cravens notes that the opinion then discusses four offenses that the majority viewed as showing his use of sucker punches. However, Cravens asserts, "it is

---

15      Although *Soper* decided the evidence underlying the charges in question in that case would be cross-admissible on the issue of intent in hypothetical separate trials (*Soper*, *supra*, 45 Cal.4th at pp. 778-779), for purposes of analyzing prejudice, it assumed the evidence would *not* be cross-admissible to prove *identity*, which, unlike the present case, was at issue in *Soper*.

exceedingly difficult to find any real evidence supporting three of these four instances in the record." In one of the instances, the majority states that Cravens jumped off the curb and delivered a sucker punch to Eric Pardee that knocked him unconscious and broke his cheekbone. (*Cravens*, 53 Cal.4th at p. 510.) However, the jury acquitted Cravens of this assault count, presumably because Pardee (and another witness) could not identify who hit him.

The *Cravens* majority also cited an instance in which Cravens sucker punched Ryan Grange at a New Year' Eve party. (*Cravens*, 53 Cal.4th at p. 510.) However, as noted, the trial court granted a motion under Penal Code section 1118.1 to dismiss the assault count based on that incident. The majority also relied on the incident at Windansea Beach in which Cravens hit Shannon O'Neill in the face when she tried to stop a fistfight between Cravens and her boyfriend. Cravens argues that this incident does not constitute evidence "tending to show [Cravens's] pattern of using sucker punches to his advantage" (*id.* at p. 509) because none of the witnesses to the incident mentioned a sucker punch in their testimony, and by her own admission O'Neill was actively involved in the brawl and therefore, in Cravens's words, "any reference to a 'sucker punch' in this context—meaning a punch where the victim is unaware of what is coming—is nothing short of mystifying."

Cravens argues that because the Supreme Court cited these instances as substantial evidence supporting the jury's finding of implied malice, this court must assume the jury considered them in finding that he consciously disregarded a risk of death when he punched Kauanui. The jury's consideration of "such attenuated evidence in finding

42

implied malice"!(Supp. AOB p. 10)!, Cravens argues, was a gross unfairness that resulted from the joinder of the other offenses, especially the three discussed above.

The problem with this argument is that the trial court ruled the evidence of the other offenses was admissible on the murder count as evidence of common scheme and plan under Evidence Code section 1101, subdivision (b), and evidence of habit or custom under Evidence Code section 1105. As we discussed above, the trial court's cross-admissibility ruling was not an abuse of discretion, and the evidence of the other offenses also would have been admissible in a hypothetical separate trial of the murder count on the issue of intent—specifically on the issue of whether Cravens acted with the intent to commit an assault or battery when he delivered the fatal blow to Kauanui, or acted in *self-defense* as he sought to prove at trial. Because the evidence of the other offenses would have been admissible in a hypothetical trial of the murder count alone, we cannot conclude that the joinder of the other offenses resulted in gross unfairness to Cravens. The court did not err in denying Cravens's severance motion, and the joinder of counts for trial did not deprive Cravens of due process.

### III.
*Instruction on How to Evaluate Evidence of the Other Counts*
*In Relation to the Murder Count*

Cravens contends the court prejudicially erred by giving an inconsistent and confusing instruction regarding the jury's consideration of evidence of other charged crimes in connection with the murder count. The challenged instruction is a modified version of CALCRIM No. 375 entitled "EVIDENCE OF UNCHARGED OFFENSE TO PROVE COMMON PLAN AND OR HABIT AND CUSTOM." The instruction reads as

43

follows: "You may consider evidence of other crimes charged against the defendant in order to show that the defendant knew his act charged in Count 12 (alleged killing of Emery Kauanui) was dangerous to human life only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged [*sic*] offenses. Proof by a preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

"If the People have not met this burden, you must disregard this evidence entirely.

"If you decide that the defendant committed the offenses, you may, but are not required to, consider that evidence for the limited purpose of deciding whether or not:

"A. The defendant had a habit or custom which is relevant to the commission of Count 12; or

"B. The defendant had a plan or scheme to commit the offenses alleged in this case.

"In evaluating this evidence, consider the similarity or lack of similarity between the uncharged [*sic*] offenses and the charged offenses.

"Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime.

"If you conclude that the defendant committed the offenses in Counts 1, 2, 5, 6, 7, 8, 9, 10, and 11, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of Count 12. The People must still prove each charge and allegation beyond a reasonable doubt."

44

Cravens contends the instruction was inconsistent and confusing because (1) the first sentence refers to "other crimes charged" and then refers to the same crimes as "uncharged offenses" that need be proven by a preponderance of the evidence only; (2) the third paragraph refers to "the offenses" without specifying whether the offenses are charged or uncharged; (3) the fourth paragraph refers to the "similarity or lack of similarity between the uncharged offenses and the charged offenses;" and (4) the last paragraph refers to "offenses in Counts 1, 2, 5, 6, 7, 8, 9, 10, and 11." Cravens argues that the instruction was prejudicial because it allowed the jury to convict him of the nonhomicide counts by a preponderance of the evidence rather than by proof beyond a reasonable doubt.

If a jury instruction challenged on appeal is ambiguous, the reviewing court must consider whether it is reasonably likely the jury misunderstood and misapplied the instruction. (*People v. Young* (2005) 34 Cal.4th 1149, 1202.) The correctness of jury instructions is determined from the instructions as a whole rather than from a particular instruction or parts of an instruction. (*Ibid.*) In assessing the probable effect of the instruction on the jury, the reviewing court must also consider whether the arguments of counsel diminished any possible confusion about the challenged instruction or reinforced the correct view of the law stated in the instruction. (*Ibid.*)

The reviewing court must assume the jurors are intelligent and capable of understanding and correlating all of the instructions they were given. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1148-1149.) "Jurors are routinely instructed to make . . . fine distinctions concerning the purposes for which evidence may be considered, and [the

45

reviewing court] ordinarily [presumes] they are able to understand and follow such instructions. [Citations.] Indeed, [courts] have described the presumption that jurors understand and follow instructions as '[t]he crucial assumption underlying our constitutional system of trial by jury.' " (*People v. Yeoman* (2003) 31 Cal.4th 93, 139.)

Applying these principles here, we conclude there was no prejudicial instructional error. The first sentence of the instruction made it clear that the instruction addressed how the jury could consider "evidence of *other crimes charged*" (italics added) against Cravens in deciding, under Count 12 (alleged killing of Kauanui), whether he knew the fatal blow he delivered to Kauanui was dangerous to human life. It was careless to refer to the "other crimes charged" as "uncharged offenses" in the same sentence (and elsewhere in the instruction), but in that context, the term "uncharged offenses" could only mean the "other crimes charged" referenced earlier in the sentence. Any possible confusion on that point would have been dispelled by the last paragraph of the instruction, which specifically referred to "the offenses in Counts 1, 2, 5, 6, 7, 8, 9, 10, and 11" in the context of directing the jury to consider whether Cravens committed those crimes as a factor in deciding whether he was guilty of Count 12. It is not reasonably likely that the obviously inadvertent use of the term "uncharged offenses" or simply "offenses" earlier in the instruction to refer to the crimes charged in Counts 1, 2, 5, 6, 7, 8, 9, 10, and 11 misled or confused the jury on that point. Considering that no evidence or issue regarding *uncharged* offenses was presented at trial, we assume the jury understood that the instruction addressed the manner in which the jury was to consider

46

the evidence of the nonhomicide *charged offenses* in relation to Count 12, despite the careless drafting of the instruction.

Further, we conclude it is not reasonably likely the jury was misled by the challenged instruction to convict Cravens of any offense by a preponderance of the evidence rather than by proof beyond a reasonable doubt.  The court instructed the jury with CALCRIM No. 103 at the beginning of the trial and CALCRIM No. 220 before deliberations, both of which explained the prosecution's burden of proving all charges beyond a reasonable doubt as follows:  "A defendant in a criminal case is presumed to be innocent.  This presumption requires that the People prove a defendant guilty beyond a reasonable doubt.  Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically tell you otherwise.  [¶] Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. . . .  [¶]  In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial.  Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty."

The challenged instruction adopted from CALCRIM No. 375 adequately explained that the lighter burden of proof by a preponderance of the evidence applied only for the limited purpose of allowing the jury to consider the evidence of the nonhomicide counts in connection with Count 12 — specifically, to consider whether Cravens "knew his act charged in Count 12 (alleged killing of Emery Kauanui) was

47

dangerous to human life," and whether he had a plan or scheme to commit the charged offenses or a habit or custom that was "relevant to the commission of Count 12." The instruction went on to emphasize that the prosecution "must still prove each charge and allegation beyond a reasonable doubt." Defense counsel also emphasized the prosecution's burden of proof beyond a reasonable doubt when she addressed count 1 (making a criminal threat) in closing argument, and the jury returned a verdict of not guilty on three of the nonhomicide counts. Considering the instructions as a whole and assuming the jurors were intelligent and capable of understanding and correlating all of them, we conclude it is not reasonably likely that the challenged instruction caused the jury to convict Cravens of any offense by a preponderance of the evidence rather than by proof beyond a reasonable doubt.

IV.
*Sufficiency of the Evidence to Support the Criminal Threat Conviction*

Cravens contends his conviction for making a criminal threat must be reversed because there is insufficient evidence that he aided and abetted the criminal threat that Wright made against Sorensen. We conclude the jury could reasonably find that Cravens aided and abetted a criminal threat.

"[A]n aider and abettor is a person who, 'acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids,

48

promotes, encourages or instigates, the commission of the crime.' " (*People v. Prettyman* (1996) 14 Cal.4th 248, 259.)[16]

Cravens first argues there is insufficient evidence that he participated in the group assault on Walsh and Sorensen's residence. We disagree. Wright testified that he picked up Cravens and others at Nunziante's house and drove the group to Sorensen's house to confront Sorensen and his group. The jury was entitled to believe Wright on that point, notwithstanding other evidence that tended to undermine his credibility. "The testimony of a single witness is sufficient to uphold a judgment even if it is contradicted by other

---

[16]     The jury was instructed with CALCRIM No. 401, which, in relevant part, states: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] Someone aids and abets a crime if he knows of the perpetrator's unlawful purpose and he specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."

The jury was also instructed with a modified version of CALCRIM No. 1300 on the elements of making a criminal threat in violation of section 422. That instruction stated, in part: "To prove that the defendant's guilt of this crime, the People must prove that: [¶] 1. The defendant willfully threatened to unlawfully kill or unlawfully cause great bodily injury to Eric Sorensen; [¶] 2. The defendant made the threat orally; [¶] 3. The defendant intended that his statement be understood as a threat and intended that it be communicated to Eric Sorensen; [¶] 4. The threat was so clear, immediate, unconditional, and specific that it communicated to Eric Sorensen a serious intention and the immediate prospect that the threat would be carried out; [¶] 5. The threat actually caused Eric Sorensen to be in sustained fear for his own safety or for the safety of his immediate family; [¶] AND [¶] 6. Eric Sorensen's fear was reasonable under the circumstances."

evidence, inconsistent or false as to other portions." (*In re Frederick G.* (1979) 96

Cal.App.3d 353, 366; Evid. Code § 411.)

Cravens next contends that even if we conclude there is sufficient evidence that he

was at the scene, there is no evidence that he shared Wright's intent to make a criminal

threat against Sorensen. Thus, we consider whether the jury could reasonably infer from

the evidence of the group assault on Sorensen's house that Cravens knew Wright intended

to make a criminal threat, and that Cravens intended to and did aid and abet Wright's

commission of that offense by promoting, encouraging, or instigating its commission.[17]

The evidence showed that Wright, Cravens, and the rest of their group acted in

concert in attacking Sorenson's house and engaging in hostile and threatening conduct

that would put reasonable persons in fear for their safety, including yelling, banging on

the house, and kicking over Sorensen's motorcycle. Concerted action reasonably implies

a common purpose. (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409.) Thus, the

---

[17]    The People note that under the "natural and probable consequences" doctrine, an aider and abettor is guilty not only of the offense he intended to facilitate or encourage (the target crime), but also of any crime that is the natural and probable consequence of the target crime. (*People v. Prettyman*, *supra*, 14 Cal.4th at p. 261.) Although the evidence supports Cravens's criminal threat conviction on a natural and probable consequences theory of aiding and abetting, the conviction cannot be sustained on that theory because the jury was not instructed on it. (See *People v. Culbertson* (1985) 171 Cal.App.3d 508, 512-513 [where prosecution based defendant's liability on aiding and abetting theory, appellate court declined "the People's invitation to switch theories in midstream" and review conviction as if defendant were the direct principal]; *Lilliock*, *supra*, 265 Cal.App.2d at pp. 429-430, overruled on another point in *People v. Flood*, *supra*, 18 Cal.4th at p. 490, fn. 12 [despite sufficiency of the evidence to support a second degree felony-murder conviction, second degree murder conviction could not be sustained on appeal on that theory because it was not presented to the jury].)

jury could reasonably infer that the attackers, including Cravens, shared the intent to threaten Sorensen by words and actions and that by their very participation in the attack, they encouraged each other in all of the elements of the attack, including the yelling of hostile and threatening statements. The evidence sufficiently supports the finding that Cravens aided and abetted Wright's criminal threat.

DISPOSITION

The judgment is affirmed.

                                                                    O'ROURKE, J.

WE CONCUR:


NARES, Acting P. J.


McINTYRE, J.